UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REV. FR. EMMANUEL LEMELSON and LEMELSON CAPTIAL MANAGEMENT, LLC<br><br>Plaintiffs,<br><br>v.<br><br>BLOOMBERG LP, MATTHEW ROBINSON, and JESSE WESTBROOK<br><br>Defendants. | CIVIL ACTION<br><br>NO. 4:16-CV-11650-TSH |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS
### (Docket Nos. 16 and 22)

**May 19, 2017**

**HILLMAN, D.J.**

The present action arises out of the reporting by Bloomberg News that plaintiff Rev. Fr. Emmanuel Lemelson ("Fr. Lemelson"), a hedge fund manager and ordained Eastern Orthodox priest, was under investigation by the Securities Exchange Commission ("SEC") for stock manipulation. Plaintiffs Fr. Lemelson and his eponymous private investment firm, Lemelson Capital Management, LLC ("LCM"), bring this action against Bloomberg, LP ("Bloomberg") as well as the article's author and editor, Matthew Robinson and Jesse Westbrook, respectively, alleging defamation (Count I); commercial disparagement (Count II); negligence (Count III); and intentional interference with prospective economic advantage (Count IV). The Defendants move to dismiss the complaint for failing to state a claim because, *inter alia*, statements asserting that a person is the subject of a civil investigation are not defamatory as a matter of law, and the third

1

amended complaint does not plead any facts to support an inference that the Defendants published the statements with "actual malice," as required to state a claim for defamation of a public figure and commercial disparagement. For the reasons outlined below, the motion to dismiss is **_granted_**.

**Background**

The following facts are taken from the third amended Complaint, and are assumed as true for the purposes of this motion. Fr. Lemelson is a "world-renowned priest, religious leader, financial expert, philanthropist, humanitarian and entrepreneur." Compl. at 1. He is the Chief Investment Officer of LMC, which is itself the general partner of Amvona Fund, LP, a hedge fund launched by Lemelson in 2012. Fr. Lemelson has engaged with, and received significant attention from, the media. He has been interviewed by several international media outlets, including Fox News. His investment research and analysis has been cited in The Wall Street Journal, USA Today, and the New York Post, among others. A profile piece on Fr. Lemelson and LCM featured in the Wall Street Journal in October 2015, ran with the headline "Hedge Fund Priest: Thou Shalt Make Money." In it, Fr. Lemelson is quoted as claiming "my whole life I always knew things before they happened. I guess it's just a gift from God."[1] Opp. Ex. 1. Barron's financial magazine ranked LMC among the top hedge funds in the world in 2013 and 2014.

On March 18, 2016, Bloomberg published an article online titled "Hedge Fund Priest's Trades Probed by Wall Street Cop," authored by Robinson (the "Article"). On March 17, prior to publication, Robinson called Fr. Lemelson for an interview. During that call, Fr. Lemelson told Robinson that he was aware that the SEC was investigating trading in a pharmaceutical company

---

[1] This *Wall Street Journal* article is referenced in Exhibit A to the Complaint, and is also a public record.

named Ligand, but that "neither he nor his firm was the target of any investigation." Compl. ¶32. Robinson responded, "well, I'm going to write that you are being investigated anyway." Compl. ¶33. Robinson sent two follow up emails and left a voicemail at Fr. Lemelson's office ahead of the Article's publication, seeking comment and asking Fr. Lemelson to contact him as soon as possible. Fr. Lemelson did not respond before Bloomberg published the Article online. The Bloomberg Article, which published online at around 10:30am, announced

> A priest who sidelines as a hedge-fund manager is being investigated by U.S. regulators for possible stock manipulation, prompting scrutiny of trading skills that the cleric has described as a "gift from God," according to people with knowledge of the matter. The Securities and Exchange Commission is examining whether the Reverend Emmanuel Lemelson of Massachusetts made false statements about companies he was shorting, said the people who asked not to be named because the probe isn't public.

Comp. at ¶¶42, 43, Ex. A. Plaintiffs claim that they were never the target of any regulatory investigation, and that the Defendants knew or should have known any statements to the contrary were false. The Article went on to state

> The SEC started its investigation after companies complained to the regulator that Lemelson, 39, had made potentially inaccurate comments about their firms in public forums, the people said. The opening of an SEC probe is typically a preliminary step and doesn't mean Lemelson, who hasn't been accused of wrongdoing, will ever face an enforcement action.
>
> While Lemelson's Amvona Fund is a minnow in the $2.9 trillion hedge fund industry, he gained attention after the Wall Street Journal published a profile of him in October. The article said Lemelson managed about $20 million, had made millions of dollars for his investors and quoted him as saying, "my whole life I always knew things before they happened. I guess it's just a gift from God"….
>
> Investors are free to criticize companies and their management, but they can't spread inaccurate information in order to profit. In the Lemelson investigation, the SEC is examining commentaries about companies including Ligand Pharmaceuticals Inc., World Wrestling Entertainment Inc. and Skechers U.S.A. Inc., according to one of the people.

> A report published on the financial markets website Seeking Alpha in June 2014 under the pseudonym Amvona said Ligand was in imminent risk of declaring bankruptcy and that demand for one of its drugs, Promacta, was rapidly declining. Within minutes, Ligand shares fell more than 7 percent. Since then, Promacta sales reached an all-time quarterly high and shares of the La Jolla, California-based company have increased 50 percent to $97.22 through yesterday.
>
> Historically, the SEC has had difficulty in bringing "short-and-distort" cases, since the regulator has to prove a misstatement of fact rather than opinion, according to Stephen Crimmins, a former SEC attorney who's now with the firm Murphy & McGonigle. Wall Street executives famously complained that short-sellers were spreading false rumors about their banks during the 2008 financial crisis, but the allegations didn't result in SEC enforcement actions.
>
> The SEC has had more success suing "pump-and-dump" fraudsters, where scammers promote stocks with fake information to inflate prices and then sell out.

Compl. Ex. A (emphasis added). Plaintiffs allege the Article misstated the content of the research report authored by LCM, and that several selections from the above-quoted text falsely implied that Fr. Lemelson was dishonest, unethical and "spread false information and rumors in order to unfairly profit." Compl. ¶¶ 47-48.

Just after publication, Fr. Lemelson emailed Westbrook and multiple Bloomberg editors to request an apology and retraction of the Article, and attached a press release issued by LCM. Bloomberg updated the story shortly thereafter, to include a quote from Lemelson's press release: "[t]here is not now, nor has there ever been, any SEC or other regulatory investigation targeting our firm,"…."[n]or is there a basis for one." Compl. Ex. A.

Later that day, Bloomberg aired a short, live television interview (the "Interview") of Robinson that essentially mirrored what was printed in the article. In describing Fr. Lemelson, the interviewer said "he [] fancies himself as I mentioned as some sort of a clairvoyant. I … suppose that's helpful if that is the case especially if you are shorting stocks." Compl. at 64, Ex. B. Fr. Lemelson asserts that this is false and implies that "he's not only delusional but unethical." Compl.

4

at 65. In response to the interviewer's inquiry into Fr. Lemelson's take on the investigation, Robinson replied that Fr. Lemelson "says he's not aware of any investigation so that's where it stands." Compl. Ex. B. Fr. Lemelson requested an opportunity to respond on air to the assertions, but Bloomberg did not extend him an invitation.

Plaintiffs allege that Defendants neither contacted the SEC nor requested information from the SEC to verify whether Fr. Lemelson or LCM were under investigation prior to publishing the Article. Plaintiffs further contend that the Defendants "deliberately omitted facts … that they knew would negate the alleged defamation," specifically that they "omitted Fr. Lemelson's statement to Robinson that he knew of an investigation involving Ligand [but that neither he nor his firm was the target of any investigation]." Compl. ¶¶ 32, 54.

The story was republished by numerous media sites. Plaintiffs allege that, since its publication, they have not received inquiries from potential investors or any additional funds from interested investors, which stemmed the growth of the fund. In addition, they allege several vendors declined to work with the Plaintiffs, and Fr. Lemelson's reputation was damaged within his religious community, costing him various opportunities.

Plaintiffs seek an order enjoining Defendants from further defamatory publications about them, and requiring Defendants to issue a public apology, as well as retraction of the article. Plaintiffs further seek $100 million in damages, costs and attorney's fees.

## Discussion

A. *Count I – Defamation*

"To establish a defamation claim under Massachusetts law, four elements are required: (1) that '[t]he defendant made a statement, concerning the plaintiff, to a third party'; (2) that the statement was defamatory such that it 'could damage the plaintiff's reputation in the community';

5

(3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he statement either caused the plaintiff economic loss ... or is actionable without proof of economic loss.'" *Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012) (quoting *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 782 N.E.2d 508, 510–11 (2003). Defendants argue that the Complaint fails on two of these elements, because 1) neither the Article nor the Interview contained any defamatory statements, and 2) the Complaint does not allege Defendants acted with the requisite level of fault.

## Defamatory Statements

"[I]n a defamation action, a threshold issue is whether the statement is reasonably susceptible of a defamatory meaning, and that determination is a question of law for the court." *Foley v. Lowell Sun Pub. Co.*, 404 Mass. 9, 11, 533 N.E.2d 196, 197 (1989). "[T]his interpretation 'requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence.'" *Id.* (citing *Myers v. Boston Magazine Co.*, 380 Mass. 336, 341-342, 403 N.E.2d 376 (1980), quoting *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980)).

Defendants seek dismissal of the Plaintiffs' defamation claim because neither the Article nor the Interview contained statements accusing Fr. Lemelson and LCM of dishonest or illegal activities, and statements merely disclosing that someone is the subject of an SEC investigation are not defamatory as a matter of law. In support of their argument, Defendants cite *Foley v. Lowell Sun Pub. Co.*, 404 Mass. 9, 11, 533 N.E.2d 196, 197 (1989), in which the SJC held that the undisputed fact of an arrest was not capable of being defamatory as a matter of law. In *Foley*, the plaintiff sued the publisher of an article that stated he had been arrested "after assaulting a police officer when he arrived on the scene." *Foley*, 404 Mass. at 10, 533 N.E.2d at

196. The plaintiff argued that the article defamed him because it falsely charged him with having actually committed the crime. *Id.* In affirming the lower court's decision, the SJC held that the statement was not defamatory as a matter of law, because when "read in the context of the article as a whole, its clear meaning [was] to report that Foley was arrested for assaulting an officer-and not that he either had been convicted of the offense or had actually committed the assault," and "a reasonable reader could not conclude that the Sun was accusing Foley of assaulting the officer." *Id.* at 11-12.

Defendants posit that, if a report of criminal arrest is not defamatory as a matter of law then, *a fortiori*, a report that someone is the subject of a civil investigation is also not defamatory as a matter of law. However, *Foley*, which involved the *undisputed* fact of an arrest is distinguishable from the instant case, where it is the *disputed* allegation of investigation by the SEC for stock manipulation that could, in the context of the entire article, be construed as defamatory. When read in the context of the article as a whole, this court finds that the allegation of an SEC probe of the Plaintiffs, which lacks the type of substantiation that was available for the arrest in *Foley*, is capable of defamatory meaning.

**Fault**

In an action for defamation, "[t]he level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." *Ravnikar*, 438 Mass. at 630, 782 N.E.2d at 511. Defendants assert that the Plaintiffs are public figures by their own admission, and are thus required to prove Defendants acted with "actual malice." In support, Defendants point to Plaintiffs' own declarations in the Complaint that Fr. Lemelson is "world-renowned," and has received media coverage in a wide variety of prominent media sources, while LMC is "ranked among the top

7

hedge funds in the world." Plaintiffs now disclaim their previous assertion, and profess to be private figures, or at worst, "limited pubic figures."

Taking all facts pled in the Complaint as true, this court finds that Plaintiffs are not private figures. This matter concerns market-moving information, and the fact that LCM published content holding itself out as expert commentary in a highly public and market-relevant forum suffices to raise LCM out of the category of private individual. Allegations in the complaint establish that, for his part, Fr. Lemelson was "world-renowned" and subject to "a great deal of interest and scrutiny due to his unique qualifications and unprecedented success." The court need not delineate the distinction between public figures and "limited public figures" because the degree of fault Plaintiffs are required to plausibly allege is the same– that Defendants acted with "actual malice."

To prove Defendants acted with "actual malice," Plaintiffs must show that the statement was "made with knowledge of its falsehood or with reckless disregard for whether it was false." *Astra USA, Inc. v. Bildman*, 455 Mass. 116, 143, 914 N.E.2d 36, 56–57 (2009) (citing *New York Times v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710 (1964)). The only facts pled that would allow any inference that the Defendants knew their statements were false or acted with reckless disregard for whether they were false, are that (1) the Defendants did not submit a formal inquiry to the SEC to determine whether Plaintiffs were under investigation, and (2) Fr. Lemelson told Robinson the day before publication of the article that neither he nor LMC were "the target" of any investigation, but Robinson said he was going to write that Fr. Lemelson was being investigated anyway.

First, Plaintiffs themselves point out that submitting an inquiry to the SEC to confirm whether subjects are under investigation would have been a fruitless exercise, as the SEC has a

policy of not confirming or denying investigations of particular individuals. Second, Plaintiffs concede that they published a report concerning Ligand, and that the SEC was investigating Ligand. It follows that Plaintiffs' public statements on Ligand were subject to investigation by the SEC. Lemelson's denial of the investigation, in consideration of these factors, simply does not create a scenario where it is plausible that Defendants' publication of allegations that the Plaintiffs were being investigated by the SEC was made knowing such statements to be false, or with reckless disregard for their falsity.

Moreover, Lemelson's personal assertion to Robinson that he was not the target of an SEC investigation is not sufficient to support the contention that Defendants published the allegations knowing them to be false or with reckless disregard for their falsity, because "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692, 109 S. Ct. 2678, 2698 n.37 (1989) (quoting *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2nd Cir. 1977) ("Surely liability under the "clear and convincing proof" standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement….")). If a subject's simple denial is sufficient to demonstrate that subsequent publication shows a reckless disregard for the truth, then no disputed fact could ever safely be published. Alleging publication in the face of Fr. Lemelson's denial is simply not enough to meet the high bar required to plausibly plead "actual malice." Accordingly, Count I is dismissed.

*Count II – Commercial Disparagement*

"[I]n order to prevail on a claim alleging commercial disparagement, a plaintiff must prove that a defendant: (1) published a false statement to a person other than the plaintiff; (2) "of and

9

concerning" the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss." *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 523, 984 N.E.2d 755, 763 (2013). The SJC has noted that the knowledge standard required to prove commercial disparagement "mirrors what has been termed 'actual malice' in the defamation context." *Id.* at 529-30. As discussed above, the Plaintiffs have not pled sufficient facts to allow a plausible inference that the Defendants acted with "actual malice." Accordingly, Count II is dismissed.

*Count III – Negligence*

Defendants argue that Plaintiffs' claim for negligence is "an inappropriate attempt to circumvent the First Amendment by alleging a common law tort with a lower standard of fault than is required to plead defamation." Mot. at 16. This court agrees. As discussed above, the Defendants may be held liable for defamation only if the Plaintiffs prove they acted with "actual malice," and their Complaint failed to allege facts that supported Defendants acted with that degree of fault. The Plaintiffs' negligence claim "is simply a restatement of [their] defamation claim under a different heading. That being so, it is not imaginable that it could escape the same constitutional constraint as [their] defamation claim." *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995). Count III is therefore dismissed.

*Count IV – Intentional Interference with Prospective Economic Advantage*

"To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present

or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Blackstone v. Cashman*, 448 Mass. 255, 260, 860 N.E.2d 7, 12–13 (2007) (citing *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781, 752 N.E.2d 700 (2001)).

This court agrees with the Defendants that the Plaintiffs have failed to plead the facts necessary to state a claim for intentional interference with prospective economic advantage. The Complaint does not plead any specific relationships that were injured by the Article, nor any facts to support that Defendants knowingly induced a breaking of the relationship, nor any facts to show that they published their Article with "improper motive or means." Accordingly, Count IV is also dismissed.

## Conclusion

Defendants' motion to dismiss the Complaint (Docket Nos. 16 and 22) is ***granted***.


**SO ORDERED.**

                                                      **/s/ *Timothy S. Hillman***
                                                      **TIMOTHY S. HILLMAN**
                                                      **DISTRICT JUDGE**